IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **SEAN C. SMITH** § | | **CIVIL ACTION NO. 2:22-cv-00244** |
| *Plaintiff* § | | |
| § | | |
| **VS.** § | | |
| § | | |
| § | | |
| **THE CITY OF SULPHUR** § | | |
| *Defendant* § | | **JURY DEMANDED HEREIN** |

## PLAINTIFF'S ORIGINAL COMPLAINT

**NOW COMES**, through undersigned counsel, Plaintiff, **SEAN C. SMITH**, who files his Original Complaint against Defendant, **THE CITY OF SULPHUR**. He hereby states as follows:

## JURISDICTION AND VENUE

1. Plaintiff brings this action under the Americans with Disabilities Act of 1990 as it appears as 42 U.S.C. § 12101 *et seq.*

2. This Court has jurisdiction pursuant to the following statutes:

   a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, law or treaties of the United States; and

   b. 28 U.S.C. § 1343 (3) and (4), which give district courts jurisdiction over actions to secure civil rights extended by the United States government.

3. Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC) on or about October 16, 2020 (Charge No. 461-2020-02048). Plaintiff received his Notice of Suit Rights on November 4, 2021. *See* Exhibit A. Plaintiff is afforded 90 days from his

receipt of such Notice to commence suit, and the date of this filing is within the statutory period.

4. Venue is appropriate in this judicial district under 28 U.S.C. § 1391 (b) because the events that gave rise to this Complaint occurred in the Western District of Louisiana, specifically Calcasieu Parish, making the Lake Charles Division the most appropriate Division for this suit.

## PARTIES

5. Plaintiff is a citizen of the United States and resides in the city of Lake Charles, State of Louisiana.

6. Defendant, **THE CITY OF SULPHUR**, is a municipal corporation organized and existing under the domestic laws of the State of Louisiana. Its principal place of business is located in the city of Sulphur, Parish of Calcasieu, State of Louisiana. All of the alleged acts occurred during Plaintiff's employment with the City of Sulphur Police Department.

## FACTUAL ALLEGATIONS

7. Plaintiff began his employment with the City of Sulphur, through the City of Sulphur Police Department, as a Police Officer on December 1, 2013.

8. On or about July 4, 2020, and after being exposed to individuals who had recently tested positive for COVID-19, Plaintiff began exhibiting symptoms of COVID-19.

9. Plaintiff did not obtain a COVID-19 test; however, Plaintiff readily advised Defendant that he had come into direct contact with COVID-19 patients and, as such, had to quarantine before returning to work.

10. On July 20, 2020, and upon exhaustion of the then-quarantine requirements, Plaintiff contacted Defendant's Human Resources Director, Connie Deville ("Deville") to notify her that, pursuant to CDC guidance, he had been symptom and fever free for at least three (3) days.

11. During the phone call between Plaintiff and Deville, Deville advised Plaintiff that, in order for him to return to work, he would have to submit to a COVID-19 serology test, which would have to return as negative. In response, Plaintiff refused to submit to a serology test; however, Deville nevertheless scheduled Plaintiff an appointment at the Prime Occupational Medicine Clinic.

12. A serology/antibody test is different from a viral test, which is the test used to determine whether someone has an active case of COVID-19 at the time.

13. Plaintiff contacted Prime Occupational Medicine Clinic, at which time he learned that the antibody/serology test being required by Defendant is an antibody test that should not be utilized for diagnostic purposes.

14. Plaintiff subsequently contacted Deville, at which time he informed her, for a second time, that he was not submitting for a serology test. In response, Deville provided Plaintiff with two (2) options: 1) submit to the serology test, the cost of which Defendant could cover; or 2) obtain, at his own expense, a negative COVID-19 test showing that he was negative for the virus at the time.

15. Upon information and belief, any request by the City that Plaintiff obtain a negative COVID-19 test at his own expense is a direct violation of La. R.S. 23:897, which deems it illegal for an employer to require any employee to pay the cost of a medical examination required by the employer as a condition of employment.

16. In response to Deville's options, Plaintiff agreed to obtain a regular COVID-19 test, so long as Defendant would cover the expense. When Deville insisted that Plaintiff, instead of Defendant, pay for a regular test, Plaintiff advised Deville that Defendant's demands were unlawful under various statutes, that he (Plaintiff) had followed proper guidelines for returning to work, and that Defendant's request was not medically necessary, nor was it a business necessity.

17. On July 21, 2020, Plaintiff received a voicemail from Craig Fortenberry ("Fortenberry"), advising him that Chief, Lewis Coats ("Coats") had learned of Plaintiff's refusal to submit to the serology/antibody test. In the voicemail, Fortenberry stated, "if you want to come back to work, you are going to take that test."

18. Plaintiff returned Fortenberry's call, at which time Plaintiff explained, in detail, the nature of the antibody test Defendant was requiring, the CDC and EEOC guidance pertaining to serology tests, and his (Plaintiff's) fear of discrimination if his antibody test were to come back positive (and therefore indicate that he had been positive for COVID-19 at some time prior thereto).

19. In response to Plaintiff's concerns, Fortenberry informed Plaintiff that Defendant's attorney had approved the antibody testing for approving an employee's eligibility to return to work, and that he (Fortenberry) was going to stand by the decision, despite clear CDC and EEOC guidance to the contrary.

20. Plaintiff provided and explained the CDC and EEOC guidance on antibody/serology testing to Fortenberry, Coats, and Assistant Chief of Police, Larry Guillotte ("Guillotte"); however, Plaintiff was informed that he would be placed on an unpaid administrative leave of absence until he agreed to submit to the serology test.

21. On July 22, 2020, Plaintiff received a letter from Coats, therein informing him that he was being placed on an unpaid leave of absence for his refusal to submit to the "serology" test. In effect, Plaintiff was placed on an indefinite, unpaid leave of absence, and his return to work for Defendant was entirely contingent upon him submitting to the serology/antibody test, which he would not do.

22. On July 23, 2020, and because Defendant was forcing him to choose between submitting to an illegal medical examination under the ADA or be placed on an indefinite, unpaid leave of absence, Plaintiff submitted a "resignation" letter, therein describing his constructive discharge from employment.

---

### FIRST CAUSE OF ACTION:
### PROHIBITED-MEDICAL-INQUIRY DISCRIMINATION IN EMPLOYMENT
*Pursuant to 42 U.S.C. 2000e et seq.*

---

23. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

24. Defendant is an "employer" subject to the provisions of ADA as defined in 42 U.S.C. 12111(5)(A). At all relevant times, Defendant was an entity engaged in an industry affecting commerce who, upon good information and belief, has employed more than fifteen employees for at least twenty (20) calendar weeks in both 2019 and 2020. 42 U.S.C. § 2000e(b).

25. At all relevant times, Plaintiff was an employee of Defendant.

26. Once an employee has been hired, the ADA prohibits an employer from requiring a medical examination or making inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity. 42 U.S.C. 12112(d)(4)(A).

27. In his letter to Plaintiff, Coats indicated, "[t]he City is paying for the Quick test which is a simple finger-stick blood 'serology' test that will provide the test results in approximately 15 minutes." Furthermore, Plaintiff was told repeatedly, by various employees and agents of Defendant, that he would have to submit to the serology/antibody test to return to work.

28. According to Defendant, the only way for Plaintiff to return to work was to submit to a COVID-19 "serology" or antibody test, which is a blood draw test that determines whether an individual had been exposed to or infected by the virus in the past. The serology test is a distinct test from PCR or antigen tests, which detect whether a person has an active COVID-19 infection. EEOC Guidance expressly distinguishes between the antibody test and COVID-19 viral tests.

29. Per the EEOC Guidance, which Plaintiff provided to Defendant, the COVID-19 antibody/serology test constitutes a medical examination under the ADA.

30. Per the CDC's Interim Guidelines, which is cited in the EEOC's COVID-19 Guidance, antibody test results "should not be used to make decisions about returning persons to the workplace." In turn, the EEOC Guidance, which Plaintiff provided to Defendant, provides that the COVID-19 antibody/serology test does not meet the ADA's "job related and consistent with business necessity" standard for medical examinations or inquiring for current employees.

31. Per the EEOC Guidance, which Plaintiff provided to Defendant, requiring antibody testing before allowing employees to re-enter the workplace is not permissible under the ADA. The EEOC Guidance further distinguishes the impermissible antibody test from COVID-19 viral tests, which are used to detect whether an individual is currently infected (and, thus, contagious) and, in contrast to antibody tests, are permissible under the ADA.

32. Plaintiff contested an allegedly improper medical examination or inquiry under 42 U.S.C. 12111(d)(4)(a). Therefore, he is not required to establish or show that he is "disabled" as defined by the ADA.

33. Plaintiff was subjected to an adverse employment action because he refused to submit to the serology/antibody test. Almost immediately after Plaintiff refused to submit to the serology/antibody test, Defendant placed him on an indefinite leave/suspension without pay.

34. In reality, the Defendant gave Plaintiff two (2) options: 1) willingly submit to a medical examination that it cannot require as a matter of law, or 2) accept indefinite leave without pay, leaving him with no job duties, money, or other means through which to provide for his family. In effect, the only way for Plaintiff to keep his position with Defendant was to condone and engage in Defendant's absolute violation of law – the law which Plaintiff actually produced to Defendant's personnel when rejecting the request that he submit for the antibody test in order to return to work.

35. An indefinite suspension without pay served as an absolute deterrent to Plaintiff refusing to engage in illegal activity.

36. Until Plaintiff agreed to partake in Defendant's illegal medical examination, he and his family would have had to live without income. Furthermore, as Plaintiff refused, as a

matter of law and principle, to engage in the medical examination, he would have had to go on indefinitely without a paycheck, which any reasonable employee would find constitutes an undue hardship.

37. Upon the understanding that Plaintiff would continue his opposition to the illegal medical examination, the placement of Plaintiff on indefinite unpaid leave is, in effect, a termination, as he would never submit to the examination and, thus, never be permitted to return to work.

38. Claimant submitted a "resignation letter" the day after he was placed on indefinite unpaid leave, wherein he detailed the fact that he had been placed on an indefinite unpaid leave, the contingency resting on his willingness to submit to a medical examination prohibited by the ADA. Plaintiff explained, at length, in his letter why the conditions of employment being imposed on him were illegal and that he had no choice by to "resign" in an effort to obtain new employment through which to support his family.

39. Plaintiff was qualified for the position as an officer and was able to perform all essential functions of the position. Plaintiff was hired for the position and performed the duties of which without issue.

40. Upon good information and belief, Defendant placed Plaintiff on an indefinite, unpaid leave of absence (terminated) or otherwise constructively discharged Plaintiff on the sole basis of his refusal to submit to an illegal medical examination under the ADA.

41. Defendant's conduct was malicious or was otherwise committed with reckless indifference to Plaintiff's federally protected rights.

42. **WHEREFORE**, Plaintiff prays that Defendant be found liable for violating the anti-discrimination provisions of the ADA, 42 U.S.C. § 12102 *et seq*.

## SECOND CAUSE OF ACTION:
## RETALIATION
*Pursuant to 42 U.S.C. 2000e et seq.*

43. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

44. Plaintiff adamantly refused to submit to a prohibited medical examination, which constitutes protected activity under the anti-retaliation provisions of the ADA.

45. Plaintiff was subjected to an adverse employment action because he refused to submit to the COVID-19 serology/antibody test. Almost immediately after Plaintiff refused to submit to the serology/antibody test, Defendant placed him on an indefinite leave/suspension without pay.

46. In reality, the Defendant gave Plaintiff two (2) options: 1) willingly submit to a medical examination that it cannot require as a matter of law, or 2) accept indefinite leave without pay, leaving him with no job duties, money, or other means through which to provide for his family. In effect, the only way for Plaintiff to keep his position with Defendant was to condone and engage in Defendant's absolute violation of law – the law which Plaintiff actually produced to Defendant's personnel when rejecting the request that he submit for the antibody test in order to return to work.

47. An indefinite suspension without pay served as an absolute deterrent to Plaintiff refusing to engage in illegal activity.

48. Until Plaintiff agreed to partake in Defendant's illegal medical examination, he and his family would have had to live without income. Furthermore, as Plaintiff refused, as a matter of law and principle, to engage in the medical examination, he would have had to go

on indefinitely without a paycheck, which any reasonable employee would find constitutes an undue hardship.

49. Upon the understanding that Plaintiff would continue his opposition to the illegal medical examination, the placement of Plaintiff on indefinite unpaid leave is, in effect, a termination, as he would never submit to the examination and, thus, never be permitted to return to work.

50. Claimant submitted a "resignation letter" the day after he was placed on indefinite unpaid leave, wherein he detailed the fact that he had been placed on an indefinite unpaid leave, the contingency resting on his willingness to submit to a medical examination prohibited by the ADA. Plaintiff explained, at length, in his letter why the conditions of employment being imposed on him were illegal and that he had no choice by to "resign" in an effort to obtain new employment through which to support his family.

51. Upon good information and belief, Defendant placed Plaintiff on an indefinite, unpaid leave of absence (terminated) or otherwise constructively discharged Plaintiff on the sole basis of his refusal to submit to an illegal medical examination under the ADA.

52. Defendant's conduct was malicious or was otherwise committed with reckless indifference to Plaintiff's federally protected rights.

53. **WHEREFORE**, Plaintiff prays that Defendant be found liable for violating the anti-retaliation provisions of the ADA, 42 U.S.C. § 12102 *et seq*.

*{Remainder of Page Intentionally Left Blank}*

## PRAYER

**WHEREFORE,** Plaintiff requests that this Honorable Court enter judgment against Defendant providing the following relief:

(a) All damages to which Plaintiff may be entitled, including but not limited to back pay, reimbursement for lost position and training, social security and other benefits, front pay, and any other statutory relief, including punitive damages;

(b) Reasonable attorney's fees, with conditional awards in the event of appeal;

(c) Pre-judgment interest at the highest rate permitted by law;

(d) Post-judgment interest from the judgment until paid at the highest rate permitted by law;

(e) Costs, including expert fees;

(f) Reasonable and necessary medical care and expenses in the past and future;

(g) Injunctive relief; and

(h) Such other and further relief, at law or in equity, to which Plaintiff may be entitled.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues if triable.

*{Signature Page to Follow}*

                    **Respectfully Submitted,**

                    **SUDDUTH & ASSOCIATES, LLC**
                    Attorneys-at-Law
                    1109 Pithon Street
                    Lake Charles, LA 70601
                    Tel: (337) 480-0101
                    Fax: (337) 419-0507
                    Email: james@saa.legal

BY:    */s/ James E. Sudduth, III*
           JAMES E. SUDDUTH, III (#35340)
           KOURTNEY L. KECH (#37745)
           PIERCE A. RAPIN (#38579)